# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 4, 2019 Session

## STATE OF TENNESSEE v. JORDAN CLAYTON, CARLOS STOKES and BRANDEN BROOKINS

**Appeal from the Criminal Court for Shelby County**
**No. 16-05861        James M. Lammey, Judge**

_____

### No. W2018-00386-CCA-R3-CD

_____

Defendants, Jordan Clayton, Carlos Stokes, and Branden Brookins, were convicted of first degree murder, conspiracy to commit first degree murder, attempt to commit first degree murder, two counts of employing a firearm during the commission of a dangerous felony, and reckless endangerment after a jury found them guilty of the murder of a seven-year-old female child. Defendant Clayton was also convicted of being a felon in possession of a firearm. On appeal, Defendants challenge the trial court's refusal to sever the cases for trial, the admissibility of a recording of a preliminary hearing and a written statement of a witness with memory loss, and the sufficiency of the evidence. We determine that the trial court did not abuse its discretion by denying a motion to sever or by admitting the preliminary hearing recording and written statement into evidence. Additionally, we determine that the evidence was sufficient to support the convictions. Consequently, we affirm the judgments of the trial court with respect to the convictions for first degree murder, attempted first degree murder, employing a firearm during the commission of a dangerous felony, and reckless endangerment. However, we reverse the judgments of the trial court with respect to the conspiracy to commit first degree murder convictions because the trial court improperly merged the conspiracy convictions with the first degree murder convictions. On remand, the trial court should reinstate the judgments for conspiracy to commit first degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, and JOHN EVERETT WILLIAMS, P.J., joined.

Juni Ganguli (at trial) and Laurie W. Hall (on appeal), Memphis, Tennessee, for the appellant, Jordan Clayton.

Nykedra Jackson (at trial) and Murray B. Wells (at trial and on appeal), Memphis, Tennessee, for the appellant, Carlos Stokes.

Claiborne Ferguson, Memphis, Tennessee, for the appellant, Branden Brookins.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Neal Oldham and Colin Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

On April 10, 2015, seven-year-old Kristan Williams was shot and killed in a drive-by shooting while she was playing outside with her friends after school on Durby Circle in Memphis. After a police investigation, Defendants Clayton, Stokes, Brookins were indicted, along with Carl Johnson,[1] for their involvement in the victim's death. An indictment was returned by the Shelby County Grand Jury in September of 2015 charging Defendants with one count of first degree murder. In October of 2016, a superseding indictment was returned by the Shelby County Grand Jury charging Defendants with one count of first degree murder, one count of conspiracy to commit first degree murder, two counts of attempted first degree murder, two counts of employing a firearm during the commission of a dangerous felony, and one count of reckless endangerment. The indictment also charged Defendant Clayton with one count of felon in possession of a firearm.

Prior to trial, Defendant Clayton filed a motion to sever his case from that of Defendant Brookins.[2] The trial court held a hearing on the motion, during which counsel for Defendant Stokes joined the motion orally. The trial court denied the motion to sever.

At trial, Alexis Hawkins testified that her daughter was four years old at the time of the shooting. She and her daughter lived on Durby Circle. Her daughter was friends with the victim. On April 9, 2015, she heard a gunshot while her "kids [were] in the tub"

---

[1] Mr. Johnson was not tried with the other Defendants.

[2] Actually, the motion asks the trial court to sever Defendant Clayton's case from that of a codefendant named Justin Ball. Mr. Ball does not appear in the record in this case. From the language in the remainder of the motion, it is apparent that Defendant Clayton meant to ask for severance from Defendant Brookins.

and she was in the "back room [of the house] getting their clothes situated for school." The shot shattered one of the windows of her house and sounded like it was fired from a close distance. Shortly thereafter, she got a telephone call from the victim's mother, asking if everyone in the house was safe. After her boyfriend arrived at the house, they called the police to report the shot.

The next morning, Ms. Hawkins got up to go to work as usual. She and the victim's mother took turns driving the children to and from school—ordinarily the victim's mother took the children to school in the morning and Ms. Hawkins picked the children up from school in the afternoon. April 10th was no different. Ms. Hawkins picked the children up that afternoon at school before she took her boyfriend to work, stopped at a friend's house, and headed home. Ms. Hawkins's mother, Angela Bibbs, was parked on the street in her car when Ms. Hawkins arrived home from picking the children up at school. When they pulled up to the houses on Durby Circle, Ms. Hawkins parked her white "truck" in the driveway of her home. The victim "jumped out the car" because she wanted to drop her backpack off with her grandmother, who was at the victim's house. Ms. Hawkins "was taking [the kids] to the mall cause it felt good" outside. Ms. Hawkins stood on the curb next to her mother's car and talked to her mother through the window while she waited for the victim to take her school things to her grandmother. At that point, nothing seemed amiss. The kids were "running around the truck playing." All of the sudden, Ms. Bibbs started yelling, "get the kids, they shooting." Ms. Hawkins looked up, saw a burgundy vehicle coming down the street, and "a young man hanging out the car" from the back seat behind the driver. Ms. Hawkins saw the man hanging halfway out of the window, leaning over the top of the car with a gun in his hand. The man was shooting over the top of the car while hanging on to the luggage rack as the car drove by. Ms. Hawkins heard about six shots as the car drove down the street. The car did not stop. Ms. Bibbs saw a hand sticking out of the passenger side window of the vehicle holding a gun. She heard two gunshots but was unable to identify anyone inside the vehicle.

Ms. Hawkins "hollered" the victim's name and told her to "get down," but by the time the victim looked at her, [Ms. Hawkins] knew "something was wrong." The victim had been shot in the head. Ms. Hawkins saw the victim try to get up from the driveway. Ms. Hawkins told the victim to stay still and yelled for the victim's grandmother.

Ms. Hawkins explained that she saw the shooter for approximately two seconds as the vehicle was driving away. She was taken to the police station and shown a photographic lineup on the night of the shooting. From that lineup, Ms. Hawkins identified one person as the shooter. Two days later, Ms. Hawkins identified a different man, Defendant Clayton, as the shooter. The individual chosen by Ms. Hawkins in the first lineup had similar facial characteristics to Defendant Clayton.

Carl Johnson testified for the State. He was indicted along with Defendants Clayton, Stokes, and Brookins but was not on trial. Mr. Johnson admitted that he told authorities several versions of the activity of the Defendants prior to the victim's death but agreed to testify truthfully at the trial of his codefendants in the hope that he would receive leniency. Mr. Johnson testified at trial that he was driving around in his mother's burgundy Chevrolet Trailblazer with Defendant Clayton on the day prior to the victim's death. He "took [Defendant Clayton] to go sell somebody [named 'White Boy'] some pills" on Durby Circle, next door to Ms. Hawkins's home. According to Mr. Johnson, when they arrived, "White Boy" came out along with "six more other dudes." The men stood near the car Mr. Johnson was driving and in which Defendant Clayton was a passenger. When they pulled up to the location, some of the men were standing on the passenger side of the car and "one dude was walking around the back of the car." When Defendant Clayton "sold 'White [B]oy' the pill, ['White Boy's' brother Rico] had tried to grab [Defendant Clayton's] gun or something and they were tussling and [Defendant Clayton] shot [Rico] in the chest." Mr. Johnson heard but did not see Defendant Clayton shoot Rico. Defendant Clayton immediately told Mr. Johnson "to pull off real fast." As they were pulling away someone shot at the back of the truck that Mr. Johnson was driving.

"White Boy" called Defendant Clayton on the phone as Mr. Johnson and Defendant Clayton were driving away from Durby Circle. Mr. Johnson could hear the conversation and overhead "White Boy" ask Defendant Clayton why he shot his brother. Defendant Clayton claimed that Rico robbed him "in front of Carlos['s] house back in November, December, and he was like he was trying to pull the same move, [Rico] was trying to rob me again." So, Defendant Clayton shot him.

In the early morning hours of the next day, April 10th, Defendant Stokes's fifteen-year-old sister was killed in a drive-by shooting. In the afternoon of April 10th, Mr. Johnson was again riding around in the burgundy Trailblazer. He was by himself when Defendant Clayton called him and asked if he could "come take him to serve 'Big Nunu' and 'Pooh-Loo' some pills." "Big Nunu" was later identified as Theodis Turner. Mr. Johnson picked Defendant Clayton up and took him to a house "in a cove" near Robin Hood Lane "going towards East Memphis." Mr. Johnson claimed that he did not go inside or "to the back" of the house. While he and Defendant Clayton were at this location, Defendant Stokes arrived in a "silver, four-door Infiniti."

Defendant Stokes parked and got out of the car and asked to talk to Defendant Clayton. Defendant Clayton got out of the car that he was riding in with Mr. Johnson and into the car with Defendant Stokes. Defendant Clayton told Mr. Johnson to pick him up "from the Taco Bell over there off Pendleton." According to Mr. Johnson, the Infiniti containing Defendants Stokes and Clayton drove away. Mr. Johnson drove off and picked Defendant Clayton up at the Taco Bell a short time later. Mr. Johnson explained

that he "pulled back up over there by 'Big Nunu' and 'Pooh-Loo['s]' house" after picking Defendant Clayton up at the Taco Bell. Defendant Brookins arrived at the house three to five minutes later, and jumped out of a black Tahoe.

Mr. Johnson recalled that outside the house, everyone was talking, "joking like take me to the hood to go sell somebody else some more bars." Defendants Stokes, Brookins, and Clayton got into Mr. Johnson's Trailblazer. Mr. Johnson recalled he was told to drive to Orange Mound and from there, Durby Circle. Mr. Johnson arrived on Durby Circle and drove twice past the house where Defendant Clayton had "shot Rico and them at." The third time Mr. Johnson drove down the street, Defendant Stokes said he did not care who was outside the house. Defendant Stokes started talking about his little sister being killed and that he wanted a "body for a body." Mr. Johnson saw "some kids" and a few adults outside the house. Mr. Johnson testified that "[Defendant] Brookins hung out the window [of the car as they drove by] and he shot one time and he tried to shoot again, [but] his gun jammed up." Immediately before he shot the gun, Mr. Johnson heard Defendant Brookins say "something like, 'hey, little bitch.'" Mr. Johnson also saw Defendant Clayton hang out the window and shoot a gun "[a]bout 20, 15 seconds later," but Mr. Johnson did not think that Defendant Clayton's bullet hit anyone. Mr. Johnson drove away quickly, heading back toward "Big Nunu" and "Pooh-Loo's" house. Halfway there, he told Defendant Brookins and Defendant Stokes to get out of his car. When they arrived back at the house, Defendant Clayton took off in the direction of Auriel Wiggins's house.

Mr. Johnson identified Defendant Brookins's gun as a black, .40 caliber Taurus. He identified Defendant Clayton's gun as a black, .40 caliber Glock 22. According to Mr. Johnson, Defendant Clayton was in the front passenger seat, Defendant Stokes was in the back seat on the driver's side of the car, and Defendant Brookins was "sitting behind Jordan Clayton in the back seat." Mr. Johnson testified that a fifth man, Brandon Derr, was in the third-row seat. According to Mr. Johnson, Defendant Stokes was in charge that day, telling people what to do. The others listened to him because "he got a lot of people under him and he tell[s] them what to do and they do it." Mr. Johnson clarified that Defendant Stokes was a member of the Blood gang and had a lot of gang members under him. Mr. Johnson explained that he was a member of the Gangster Disciples gang.

Mr. Johnson admitted on cross-examination that he gave several statements to authorities that were replete with lies. He explained at trial that he lied when first questioned because he was "scared" but claimed that he was telling the truth in the second statement he gave to police and in his testimony at trial.

Ashinik Johnson, Mr. Johnson's mother, confirmed that she owned a 2003 Chevrolet Trailblazer in April of 2015. At the time, she was living at the Budget motel with Mr. Johnson. One day in April, she was at the motel room with Mr. Johnson, her

daughter Marshanik Butler, her granddaughter, and her "friend dude." Mr. Johnson called Defendant Clayton on the phone. Mr. Johnson was lying on the bed during the telephone call, and Ms. Johnson was seated next to him such that she could hear the conversation. The two men talked about the gunshot hole in the back of her truck. Defendant Clayton claimed that "he had got into it with somebody and they had a shoot out." Ms. Johnson also heard Mr. Johnson talking to Defendant Clayton about "a little girl being shot." Ms. Johnson claimed she heard Defendant Clayton admit that "he killed the little girl."

Eventually, Mr. Johnson along with Defendants Clayton, Brookins, and Stokes were developed as suspects in the death of the victim. Defendant Brookins was interviewed by Detective Robert Wilkie of the Memphis Police Department. Defendant Brookins admitted that he was in the vehicle seated behind the driver during the shooting. Defendant Brookins recalled that there were two people with guns and that several shots were fired.

Several people that were present on Durby Circle at the time of the shooting testified at trial. Tenic Baker was sitting in the front yard of her parent's home, across the street from the location of the shooting. Ms. Baker saw a "truck" drive through the neighborhood at least twice before a window on the passenger side was lowered and shots were fired at a little girl. The truck sped off after the shots were fired. Ms. Baker was unable to identify anyone in the truck.

Mario Moore was also standing outside on the day of the shooting. He heard the shots, looked down the street, and saw the young girl on the ground. Mr. Moore recalled that the shots came from a truck driving down the street but that he did not see the shooter.

Annie Vaughn had lived on the corner of Durby Circle and Labelle Street for twenty-five years. She lived next door to the victim. On the day of the incident she saw "a burgundy truck keep riding slowly down the street back and forward." Ms. Vaughn later described the vehicle as an "SUV." She further explained that the SUV "[m]ade about two or three trips like that" up and down the street "slowly" at about "15, 20" miles per hour. Ms. Vaughn wondered what the people in the vehicle were doing as she had "never seen [that vehicle] on that street." About the third time down the street, she "saw a gentlemen raise up out of his window on the [front] passenger side of that car" and "point the pistol at the baby's head." The car stopped momentarily and the man with the gun looked around, pointed the gun at the victim, and started shooting. She heard two or three shots. Ms. Vaughn started screaming. Then, "[t]he car pulled off and stopped. When it passed by three houses from where the baby was laying, it stopped and the gentlemen raised up from the same front window, looked out, raised his body out so he could see the back and said I got her." Ms. Vaughn continued to scream and holler and

ran down the street toward the victim. Ms. Vaughn did not give a statement on the night of the shooting. However, ten days after the shooting, Ms. Vaughn identified Defendant Clayton as the shooter in a photographic lineup and gave a statement to police. Ms. Vaughn explained that she did not come forward because she "didn't want to get caught up in anything." She admitted on cross-examination that she testified at an earlier proceeding that she could not recall if the windows of the SUV were tinted and that she did not tell officers in her statement that the shooter said, "I got her."

Officer Brandon Westrich of the Memphis Police Department responded to the call of shots fired at 5:54 p.m. He and a partner, Officer Mujahed Abedellatif, were about a block away from the location of the shooting and arrived within minutes of the call. When Officer Westrich arrived, there "was a crowd of individuals, women and children" standing outside a house on Durby Circle. There was "a little girl lying face down in the middle of the drive way. She had blood around her head." Officer Westrich relieved a neighbor who was holding a towel to the victim's head. Officer Westrich continued to put pressure on the victim's wound until an ambulance arrived shortly thereafter and transported the victim to the hospital. Officer Abedellatif explained that all the people on the scene were "telling [them] who - - what kind of vehicle it was." He was able to put out a broadcast about "two, three minutes" after they arrived on the scene giving a description of the shooter's vehicle.

Defendants Clayton and Brookins both gave statements to the police, which were redacted prior to trial to remove any references to the other Defendants. In Defendant Clayton's statement, he explained that he was on Durby Circle on April 9 in the burgundy SUV with Mr. Johnson. They went to the street to sell some "bars" to someone named "Red." At that point, Rico pulled a gun out on Defendant Clayton and tried to rob him again. Defendant Clayton explained that Rico had robbed him about five months prior to that date. There was a tussle over the gun, and Defendant Clayton shot Rico. Defendant Clayton and Mr. Johnson left the scene. The next day, Defendant Clayton was at "Nunu's" house to sell him some "bars." There was a discussion about Defendant Stokes's sister having been killed the night before. Defendant Clayton claimed that he left "Nunu's" house with Mr. Johnson and was dropped off at Kimball Cabana Apartments to stay with his girlfriend, where he remained for the evening. Defendant Clayton claimed that he did not know about the victim's death until April 11th. Defendant Brookins, on the other hand, admitted in his statement that he was in the car with Mr. Johnson when the victim was killed. Defendant Stokes did not give a formal statement but admitted that he was at Mr. Turner's house on the day of the victim's murder when he talked to police about his own sister's death. He also stated that he "really didn't give a f*** about [the victim's] death because his own sister was dead."

Theodis Turner, also known as "Nunu," testified at trial that he had suffered a stroke and could not recall any of the events that took place on April 10th. Mr. Turner

did not recall making a statement to police or testifying at the preliminary hearing. Mr. Turner listened to a portion of a recording from the preliminary hearing and recognized his own voice, but could not recall testifying at the hearing.

The preliminary hearing testimony was played for jury. During the preliminary hearing, Mr. Turner testified that Defendant Clayton and Mr. Johnson showed up at his house in a red Trailblazer. Defendant Stokes and Defendant Brookins came to his house in an Infiniti. Mr. Turner testified that Defendant Stokes was upset about his sister's murder and was "huddled up in a crowd" talking to the other men about the murder. Mr. Turner testified that the men were also talking about Defendant Clayton getting robbed at Defendant Stokes's house prior to Defendant Stokes's sister's murder. Defendant Stokes said something had to be done about the murder of his sister. At first, Mr. Turner testified Defendant Stokes did not say what needed to be done but then acknowledged that he gave a statement to police in which he said Defendant Stokes wanted "a body" because his sister was killed. Mr. Turner did not see anyone with a gun but testified that the men all "toted" weapons on a regular basis. Mr. Turner testified that everyone left after that, but only Defendant Brookins and Mr. Johnson came back to his house a short time later.

Mr. Turner was able to identify his signature on each of the pages of his statement to police and the photographic lineups where he identified the Defendants. Officer Fausto Frias then testified that Mr. Turner gave the following statement:

> [I w]as at [my] house and [Defendant Clayton] came over to sale [sic] me some bars. He was in [Mr. Johnson's] red truck and [Mr. Johnson] was driving. He came to the back porch and sold me the bars. [Defendant Stokes] pulled up in his grey Infiniti with [Defendant Brookins]. [Defendant Stokes] got out of the car. I saw that [Defendant Brookins] had a black gun. [Defendant Stokes] called [Defendant Clayton] to the side and told him to bring him a body for a body and he wanted it now. [Defendants Clayton, Brookins, and Stokes] pulled off in [Defendant Stokes's] car and [Mr. Johnson] pulled off behind them. I think 15 minutes went by and they pulled back but [Defendant Clayton] was not with them. They came to the back porch looking suspicious. I asked them what happened but no one said shit. I began hearing sirens and they all left from my house.

In the statement, Mr. Turner claimed that he only saw Mr. Johnson, Defendant Clayton's brother "Little B," and Defendant Brookins in the red Trailblazer. He did not see Defendant Stokes in the red Trailblazer. Mr. Turner explained that Defendant Stokes wanted a "body for a body":

[b]ecause he fel[t] that [Defendant Clayton] was responsible for his sister getting kill[ed] . . . because [Defendant Clayton] shot somebody the night before and they thought that [Defendant Clayton] lived at Carlos['s] house, because the same guy [Defendant Clayton] shot robbed [Defendant Clayton] some months back at Carlos['s] house.

During the investigation, police found a .40 caliber bullet that penetrated an exterior wall of Ms. Hawkins's home and eventually came to rest in the bathtub. The bullet had the same class characteristics as one test-fired from the gun found in Defendant Clayton's possession during his arrest: a black .40 caliber Glock 22 imprinted with the words "Arkansas Highway Police." Cell phone technology placed Defendant Clayton in the area of Durby Circle at the time of the shooting. Likewise, data from a GPS monitoring device worn by Mr. Johnson placed him at Durby Circle at the time of the shooting.

None of the Defendants testified at trial. Defendant Clayton introduced testimony from a friend, Auriel Wiggins, who claimed that he was at her house the afternoon of April 10 and stayed there doing drugs and "chillin" until the next day. Ms. Wiggins never told police that Defendant Clayton was with her on the day of the shooting.

All three Defendants were convicted as charged in the indictment. The trial court imposed a life sentence for each murder conviction. At a subsequent sentencing hearing, the trial court sentenced Defendant Clayton to 15 years for his conspiracy conviction, 15 years for each attempted murder conviction, six years for each conviction for employing a firearm, two years for his reckless endangerment conviction, and two years for being a convicted felon in possession of a firearm; sentenced Defendant Stokes to 20 years for his conspiracy conviction, 20 years for each attempted murder conviction, six years for each conviction for employing a firearm, and two years for his reckless endangerment conviction; and sentenced Defendant Brookins to 15 years for his conspiracy conviction, 15 years for each attempted murder conviction, six years for each conviction for employing a firearm, and two years for his reckless endangerment conviction. The trial court merged each conspiracy conviction into the corresponding murder conviction and ordered the sentences to be served consecutively. The resulting total effective sentence for each defendant was: Defendant Clayton – life plus 46 years; Defendant Stokes – life plus 54 years; Defendant Brookins – life plus 44 years. The trial court denied motions for new trial and this appeal followed.

*Analysis*

*I. Denial of Motion to Sever*

On appeal, each of the Defendants argues that the trial court improperly denied a severance of their cases.

As mentioned above, prior to trial, Defendant Clayton filed a motion to sever his case from that of the remaining Defendants pursuant to Tennessee Rule of Criminal Procedure 14(C)(2)(A) and (B). In the motion, Defendant Clayton alleged that Defendant Brookins pointed the finger at Defendant Clayton and Mr. Johnson; Mr. Johnson claimed that Defendants Clayton and Brookins were shooters; and Defendant Clayton claimed that he had an alibi. Defendant Clayton noted that the State offered to redact the statements of Defendants Clayton and Brookins to avoid any issues that would be classified as *Bruton v. United States*, 391 U.S. 123 (1968), issues. Defendant Clayton asked the trial court to sever his case because the defenses at trial would be "antagonistic" and specifically asked the trial court to sever his case from that of Defendant Brookins. Neither of the remaining Defendants filed a written motion to sever. The trial court held a hearing on the matter. At the hearing, Defendant Stokes orally joined in the motion to sever. It does not appear that Defendant Brookins joined in the motion. The trial court commented that there was:

> [No] difference in this and any other case where codefendants are joined for trial when the State is redacting the statements to just talk about what that particular defendant who gave the statement - - what his actions were. So it's not unlike any of the others. I think - - and that doesn't - - would not prevent you from - - any of you from presenting a defense. The alibi witness – they can believe the alibi witness or they can believe someone who's charged in the indictment. It is up to the jury to decide who they want to believe, so I'm going to deny the request for severance.

Joint trials of defendants who are indicted together are essential to the promotion of judicial efficiency and "'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1987)). Under Tennessee Rule of Criminal Procedure 8(c), an indictment may charge multiple defendants:

> (1) if each of the defendants is charged with accountability for each offense included;

> (2) if each of the defendants is charged with conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy; or

> (3) even if conspiracy is not charged and all of the defendants are not charged in each count, if the several offenses charged:

(A) were part of a common scheme or plan; or

(B) were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

The rule of joinder promotes judicial economy and efficiency by encouraging a single trial for offenses arising out of a single criminal episode. Tenn. R. Crim. P. 8, Advisory Comm. Cmts.

However, a defendant can seek a severance from his codefendants under Tennessee Rule of Criminal Procedure 14. A trial court is required to grant the severance if it is found to be "appropriate to promote a fair determination of guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2).[3] In *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018), our supreme court noted:

[t]here is no bright-line rule as to when a trial court should grant a defendant's request for severance. Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance: the number of defendants named in the indictment, the number of counts charged in the indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a co-defendant(s) which is inadmissible or excluded as to another defendant. *See United States v. Gallo*, 668 F.Supp. 736, 749 (E.D.N.Y. 1987).

Of course, where multiple defendants are charged in the same indictment, "evidence that is not necessarily applicable to another defendant may be admissible against one or more defendants." *Harbison*, 539 S.W.3d at 159 (citing *State v. Meeks*, 867 S.W.2d 261, 369 (Tenn. Crim. App. 1993)). However, the introduction of such evidence does not mandate severance. This Court has previously held that, "[w]hile 'mutually antagonistic' defenses may mandate a severance in some circumstances, they are not prejudicial per se." *State v. Russell David Farmer*, No. 03C01-9206-CR-00196, 1993 WL 247907, at *4 (Tenn. Crim. App. July 8, 1993) (quoting *Zafiro*, 506 U.S. at 537).

---

[3] A defendant may also "move[ ] for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant . . . ." Tenn. R. Crim. P. 14(c)(1). Defendant Clayton's and Defendant Brookins's statements in this case were redacted to remove any references to the other Defendants. Accordingly, our ruling in this case concerns only Tennessee Rule of Criminal Procedure 14(c)(2).

A trial court's denial of a motion for severance is reviewed by this Court under an abuse of discretion standard. *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008); *State v. Carruthers*, 35 S.W.3d 516, 552 (Tenn. 2000). An abuse of discretion occurs when a trial court "applie[s] an incorrect legal standard or reache[s] a decision against logic or reasoning that cause[s] an injustice." *Dotson*, 254 S.W.3d at 387-88 (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (internal quotation marks omitted)). Thus, we will uphold the trial court's ruling if reasonable minds can disagree with the propriety of the decision, *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000), and will not substitute our judgment for that of the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). We do not interfere with the trial court's exercise of its discretion unless the denial of the motion for severance results in clear prejudice to the defendant. *Carruthers*, 35 S.W.3d at 552. Reversal is required only when the defendant establishes that he was "clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." *Id.* at 553 (quoting *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969), *superseded by statute on other grounds*, T.C.A. § 27-111 (Supp. 1970)); *see Ellis v. State*, 403 S.W.2d 293, 294-95 (Tenn. 1966).

We shall discuss the propriety of the trial court's ruling with respect to each Defendant in turn.

### A. Defendant Clayton

On appeal, Defendant Clayton reiterates the argument in his motion that the defense strategy employed by each Defendant was "antagonistic," necessitating a severance prior to trial. Defendant Clayton explains that his theory was that he was not even present at the shooting and that Defendant Brookins claimed he was the shooter. The State argues that Defendant Clayton has waived the issue because he has failed to provide a sufficient record to establish that the defenses were mutually antagonistic. Specifically, the State points out that neither Defendant Clayton nor Defendant Brookins testified at trial; that Defendant Clayton failed to include the transcripts of the opening and closing statements in the record; and that the record fails to show that the defenses were mutually antagonistic because the redacted versions of the Defendants' statements do not implicate each other.

We disagree with the State's argument that Defendant Clayton has waived the issue by providing an inadequate record. The transcript of the entire trial is included and it is clear from reading the testimony and argument of counsel that Defendant Clayton's defense was that he was not even present at the murder. Moreover, we determine that the trial court did not abuse its discretion in denying Defendant Clayton's motion for severance. The severance was not necessary "to promote a fair determination of guilt or

- 12 -

innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2). The trial court considered the request for severance prior to trial and based its decision on the proper legal standard. The trial court instructed the jury to give "separate consideration to each [D]efendant" and instructed the jury on criminal responsibility. Though Defendant Clayton argued that he was not even present at the shooting and offered an alibi witness, the jury heard this proof and clearly did not accept this version of the events. A jury is presumed to follow the instructions given by the trial court, "with commonsense understanding of the instructions in the light of all that has taken place at the trial [that is] likely to prevail over technical hairsplitting." *State v. Knowles*, 470 S.W.3d 416, 426 (Tenn. 2015) (quoting *Boyde v. California*, 494 U.S. 370, 381 (1990)). To overcome this presumption, the defendant must show by clear and convincing evidence that the jury failed to follow the trial court's instructions. *State v. Newsome*, 744 S.W.2d 911, 915 (Tenn. Crim. App. 1987) (citing *State v. Vanzant*, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983)). Defendant Clayton has presented no evidence to overcome this presumption. We conclude that the trial court did not abuse its discretion in denying Defendant Clayton's motion for severance based on a finding that severance was not required for a fair determination of guilt or innocence.

## B. Defendant Stokes

Prior to trial, Defendant Stokes orally joined in Defendant Clayton's motion to sever without articulating a separate basis for relief. Now, on appeal, Defendant Stokes argues that the only "significant" evidence against him was the testimony of Mr. Johnson, who was a charged accomplice, and the statement of Mr. Turner, neither of whom were an eyewitness to the crime. The State insists that Defendant Stokes has waived the issue by failing to file his own motion to sever and/or properly articulating a basis for relief that was separate and apart from the grounds raised in Defendant Clayton's motion, which pertained only to Defendant Clayton's case. Moreover, the State argues that Defendant Stokes has waived consideration of the issue by "chang[ing] horses midstream" and arguing a different theory on appeal. We agree. "A party may not take one position regarding a ground in the trial court and change its strategy or theory midstream and advocate a different ground or reason in this Court." *See State v. Aucoin,* 756 S.W.2d 705, 715 (Tenn.Crim.App.1988); *State v. Dobbins,* 754 S.W.2d 637, 641 (Tenn.Crim.App.1988). Defendant Stokes has waived this issue.

## C. Defendant Brookins

Lastly, Defendant Brookins argues on appeal that his case should have been severed because the defenses of Defendants Clayton and Stokes were "incompatible" with his own defense and created an environment that was prejudicial to his case. Defendant Brookins asserts that he was denied a fair trial because the jury was allowed to hear three different defense theories and, therefore, could not possibly have believed any

of them.  The State argues that Defendant Brookins has waived the issue by failing to either file a written motion to sever or orally join in the motion to sever argued prior to trial.  We agree.  A motion for severance of defendant "shall be made before trial" unless "based on a ground not previously known."  Tenn. R. Crim. P. 14(a)(1)(A).

From our review, it does not appear that counsel for Defendant Brookins joined either orally or in writing with the motion to sever filed by Defendant Clayton.  Defendant Brookins does not base his allegation that the trial court erred in refusing to grant the severance on a ground "not previously known."  Tenn. R. Crim. P. 14(a)(1)(A).  This issue is waived.  *See State v. Camerson*, 909 S.W.2d 836, 853 (Tenn. Crim. App. 1995) (citing *State v. Eldridge*, 749  S.W.2d 756, 757 (Tenn. Crim. App. 1988)) ("Failure to present [a motion to sever] before trial amounts to a waiver of the issue.").  Defendants Brookins and Stokes are likewise not entitled to plain error review.  Defendants' briefs contain no mention of plain error analysis, and they do not expressly address any of the plain error factors.  Defendants bear the burden of persuading this Court that the trial court committed plain error and that the error probably changed the outcome of the trial. *See State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016).  We refuse to entertain a plain error analysis because Defendants Brookins and Stokes have failed to show that the issue was not waived for tactical reasons.

## II.  Admission of Mr. Turner's Prior Statements

All three Defendants argue on appeal that the trial court erred in admitting both Mr. Turner's written statement to police and preliminary hearing testimony, albeit for different reasons.  The admissibility of evidence rests within the trial court's sound discretion, and this Court will not overturn a trial court's decision regarding the admissibility of the evidence absent an abuse of that discretion.  *State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017).  A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'"  *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Initially, we note that both the prior written statement and prior testimony are hearsay, "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  Generally, hearsay is inadmissible.  Tenn. R. Evid. 802.  The exceptions to the hearsay rule are found in Tennessee Rules of Evidence 803 and 804.  While a trial court's factual and credibility determinations in ruling on a hearsay objection are binding on this Court unless the evidence preponderates against them, whether a statement satisfies an exception to the hearsay rule is a question of law subject to de novo review.  *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

Tennessee Rule of Evidence 804(a)(3) allows a witness to be declared unavailable when a witness "demonstrates a lack of memory of the subject matter of the declarant's statement." "Memory lapse, if demonstrated to the trial judge under Rule 104(a),[4] is enough to get the contents of recorded recollection read to the jury, and the same condition should be enough to get cross-examining sworn former testimony before the jury." Tenn. R. Evid 804, Advisory Comm'n Cmts (footnote added). If the witness is deemed unavailable, Tennessee Rule of Evidence 804(b)(1) permits hearsay in the form of "former testimony" that was "given as a witness at another hearing of the same or a different proceeding . . . , if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination."

Tennessee Rule of Evidence 803(5) provides that a "recorded recollection," or a "memorandum or record concerning a matter about which a witness once had knowledge" but at the time of testimony cannot recall "may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party" if the recording is "shown to have been made or adopted by the witness when the matter was fresh in the witness's memory."

Tennessee Rule of Evidence 803(26) provides for the admission of hearsay in the form of a prior inconsistent statement "otherwise admissible under Rule 613(b)[5] as substantive evidence if all of the following conditions are satisfied:"

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

---

[4] "Preliminary questions concerning the qualification of a person to be a witness . . . or the admissibility of evidence shall be determined by the court[.]" Tenn. R. Evid. 104(a)

[5] "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b).

Tenn. R. Evid. 803(26) (footnote added).  The 2009 Advisory Commission Comment to this section provides as follows:

> Subsection (26) alters Tennessee law by permitting some prior inconsistent statements to be treated as substantive evidence.  Many other jurisdictions have adopted this approach to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example.  This rule incorporates several safeguards to assure that the prior inconsistent statements are both reliable and authentic.
>
> To be considered as substantive evidence the statement must first meet the traditional conditions of admissibility[,] which include the procedural aspects of inconsistent statements as addressed in Rule 613.  This reference also makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule.

Tenn. R. Evid. 803(26) Advisory Comm'n Cmt. (2009).

### A.  Preliminary Hearing Testimony

At trial, prior to the testimony of Mr. Turner, the trial court held a jury-out hearing after being told by counsel that Mr. Turner "didn't remember anything about this case, he doesn't know why he's subpoenaed because he's had a stroke or something like that, he doesn't remember anything."  In the jury-out hearing, Mr. Turner testified that he had suffered a stroke.  He confirmed that he recognized Defendants Stokes, Clayton, and Brookins but did not recall testifying at the preliminary hearing on the matter or giving a statement to police.  Mr. Turner explained he was "heavily on drugs" at that time and had no memory of his prior testimony.  Counsel for the State played a portion of the preliminary hearing recording for Mr. Turner.  He was able to identify his own voice but claimed that he could tell he was "high" at the time of his testimony because of the way his voice sounded on the recording, like he had a "frog" in his throat.

Counsel for Defendant Stokes argued that the recording of the preliminary hearing testimony was inadmissible because prior counsel for Defendant Stokes[6] did not get to adequately cross-examine Mr. Turner at the hearing.  Counsel explained that at the preliminary hearing, the general sessions court was concerned about the number of lawyers involved and "ask[ed] that defense counsel not ask the same questions of a witness" if that question had already been asked.  From our review of the recording of the preliminary hearing, the general sessions court commented it was "not going to allow the

---

[6] Defendant Stokes was represented by different counsel at the preliminary hearing than at trial.

same questions [to] be asked to go through it over, and over, and over again" based on the fact that there were four defendants and at least seven witnesses. Counsel for Defendant Stokes admitted that Mr. Turner was subject to cross-examination by counsel for the remaining Defendants at the preliminary hearing.

The trial court, by observation of the witness, commented that it appeared Mr. Turner just did not want to testify. The trial court did not "necessarily believe he doesn't remember" but acknowledged that the witness's credibility was a jury question. The trial court determined that the recording was admissible because Mr. Turner was unavailable under Tennessee Rule of Evidence 804. The trial court determined that the prior testimony "could come in under unavailability." At trial, once the jury was brought back in, Mr. Turner identified each of the Defendants. He testified that he did not recall testifying at the preliminary hearing because he had a stroke. A portion of the recording was played and Mr. Turner identified his own voice on the recording. He testified that he could tell that he was "under the influence of heroin" at the time of the recording based on how his voice sounded. Mr. Turner claimed that he would "say whatever" when he was under the influence of drugs and claimed he was using heroin, smoking "bars," using cocaine, and drinking "syrup" at the time of the preliminary hearing. The trial court played the preliminary hearing recording for the jury.

Now, on appeal, Defendants Stokes and Clayton argue that the trial court erred in admitting the preliminary hearing testimony because it was unreliable. Defendant Stokes argues that the trial court improperly determined that Mr. Turner was unavailable and that the introduction of the preliminary hearing testimony violated Defendant Stokes's right of confrontation because he did not get to fully cross-examine Mr. Turner at the preliminary hearing. Lastly, Defendant Brookins argues that the trial court could not declare Mr. Turner "simultaneously" available and unavailable for testimony at trial.

Defendant Stokes argues that merely pretending to have memory loss does not make a witness unavailable for purposes of Tennessee Rule of Evidence 804. We disagree. In *State v. Davis*, 466 S.W.3d 49, 65 (Tenn. 2015), our supreme court determined that whether the trial court actually believed the witness lacked memory of the testimony is not necessarily relevant. When a trial court suspects that a witness "may be feigning or exaggerating his or her inability to recollect the relevant matters," the trial court should "order the witness to testify." *Id*. If the witness persists that they do not remember, the trial court can deem the witness unavailable. *Id*. While the court in *Davis* did not technically order the witness to testify even though it suspected that the witness was feigning memory loss, our supreme court found the error "was clearly harmless" based on the fact that the witness was sworn and the trial court questioned the witness with regard to his memory lapse. *Id.* at 66-67. Likewise, the witness herein was sworn and questioned by counsel for the State thoroughly regarding his memory of his testimony at the preliminary hearing, and he persistently insisted that he had no memory

of the prior events. In our view, the trial court's failure herein to order Mr. Turner to testify prior to declaring him unavailable, if anything, was harmless. In other words, if the trial court had further ordered Mr. Turner to testify, it "would have been fruitless." *Id.* at 67. Defendants are not entitled to relief on this issue.

Defendant Stokes and Clayton argue that the trial court should have excluded the preliminary hearing testimony because Mr. Turner claimed he was under the influence of drugs when he gave the testimony. Essentially, this is an argument that the preliminary hearing testimony is unreliable. Prior to the admission of the preliminary hearing testimony, the State had to establish that Mr. Turner was presently unavailable and that the evidence carries its own indicia of reliability. *State v. Arnold*, 719 S.W.2d 543, 548 (Tenn. Crim. App. 1986) (stating the rule of *Ohio v. Roberts*, 448 U.S. 56 (1980)). The United States Supreme Court has said that reliability of a prior testimonial statement is shown exclusively via cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004). Mr. Turner was subject to cross-examination at the preliminary hearing. In our view, the prior testimony carried its own indicia of reliability. Moreover, the jury saw Mr. Turner testify at the trial, where he claimed he had no memory of the testimony because he had a stroke and that he was under the influence of various drugs at the time of the preliminary hearing. "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Defendants are not entitled to relief on this issue.

Defendant Stokes also argues that he did not actually have the opportunity to cross-examine Mr. Turner at the preliminary hearing and that the eventual admission of the preliminary hearing testimony ran afoul of the principles set forth in *Crawford.* Defendant Stokes did not raise this issue in his motion for new trial. Therefore this issue is waived. Again, Defendant Stokes's brief contains no mention of plain error analysis, and he does not expressly address any of the plain error factors. The defendant bears the burden of persuading this Court that the trial court committed plain error and that the error probably changed the outcome of the trial. *See Martin*, 505 S.W.3d at 505. We refuse to entertain a plain error analysis because the record indicates that the Defendants were not prohibited from cross-examining the witnesses. At the outset of the preliminary hearing, based on the sheer number of defendants and lawyers involved, the General Sessions Court asked counsel for each Defendant to be mindful about asking repetitive questions – in other words, if counsel for another defendant had already asked the question, to refrain from repeating the question. The trial court did not prohibit counsel from cross-examining any witnesses, and Defendant Stokes has not alleged that there were any specific questions that he was prevented from asking or any questions that he wanted to ask but felt that he could not ask based on the request from the General Sessions Court. Courts of this state have consistently upheld the admission of testimony from a preliminary hearing when the defendant had an opportunity to cross-examine a

witness who was subsequently deemed unavailable. *See State v. Charles Lee Warner,* No. M2016-02075-CCA-R3-CD, 2018 WL 2129509, at *17 (Tenn. Crim. App. May 9, 2018) (citing a litany of cases supporting this proposition), *no perm. app. filed.* The trial court did not abuse its discretion in admitting the recording of the preliminary hearing transcript. Defendants are not entitled to relief on this issue.

### B.  Prior Statement to Police

During the jury-out hearing, Mr. Turner testified that he did not recall making a statement to police. However, he identified his own signature on a four-page statement and on the accompanying photographic lineups on which he had identified each Defendant. The trial court initially determined the "[p]rior statement isn't under the prior testimony, that comes in under record of recollection shown to have been made by the witness when the matter was fresh in the witness'[s] memory and to reflect that knowledge correctly." The trial court commented that under Rule 803(5), the statement could be read into evidence but could not be received as an exhibit unless offered by an adverse party. The State sought to introduce the statement under Tennessee Rule of Evidence 803(26), prior inconsistent statement, so that the statement itself could be offered as substantive evidence. Counsel for Defendants disagreed, commenting that "you cannot have an unavailable witness under 804 (for purposes of the preliminary hearing recording) and an available witness under 803 (for purposes of the written statement)." Defendants argued that admitting the written statement as substantive evidence violated their right to confrontation and effective cross-examination of the witness. The State again brought *Davis* to the trial court's attention. At that point, the trial court "changed [its] mind." After an extensive back and forth with counsel, the trial court ultimately concluded that the written statement was admissible pursuant to the Supreme Court's ruling in *Davis* and under Rule 803(26).

Now, on appeal, Defendants Clayton and Brookins argue that the trial court erred in determining the statement to police was admissible under Tennessee Rule of Evidence 803(26) because the trial court considered the witness to be available for purposes of the admissibility of his written statement and unavailable for purposes of the admissibility of his preliminary hearing testimony.[7] Defendant Brookins also argues that the admissibility of Mr. Turner's prior statement violates the Confrontation Clause because he was not subject to cross-examination. Defendant Stokes does not appear to join in this argument but instead insists that Mr. Turner's statement to police was not admissible

---

[7] Defendant Clayton did not raise this issue in his motion for new trial. Therefore, it is waived. Tenn. R. App. P. 3(e). However, we will address the issue because it was raised by Defendant Brookins.

pursuant to Tennessee Rule of Evidence 803(26) because it was not reliable and because Mr. Turner was not subject to cross-examination.[8]

While we ordinarily disfavor quoting large portions from opinions, in this case, our supreme court expertly addressed this exact issue in *Davis*. Our supreme court determined:

> [A] prior statement about events that a witness claims at trial to be unable to remember is "inconsistent" with the witness'[s] trial testimony. Indeed, the Advisory Commission Comment specifically includes as an example a witness who asserts a lack of recollection at trial. That witness'[s] prior statement is, for the purposes of the Rule, inconsistent. This comports with common sense: A prior statement relating particular facts is certainly not consistent with a subsequent lack of recollection. Accordingly, we will not construe "inconsistent" so narrowly as to require accounts that differ in their recitation of the facts. Moreover, this holding is in accord with decisions construing the meaning of "inconsistent" in Tennessee Rule of Evidence 613(b), which, under certain circumstances, allows a party to impeach a witness with extrinsic evidence of prior inconsistent statements. *See, e.g., State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (indicating that a prior statement is inconsistent for the purposes of Rule 613(b) when the witness at trial denies or equivocates about having made the statement); *see also State v. Kendricks*, 947 S.W.2d 875, 882 (Tenn. Crim. App. 1996) (stating that, if a witness does not recall making a statement, the prior statement can be used to impeach the witness); [Neil P. ]*Cohen*[*, et. al, Tennessee Law of Evidence*] § 6.13[3] [(6th ed. 2011)] (noting that "evasive answers at trial may make an earlier statement inconsistent with the trial testimony").

> We also hold that a trial court's suspicion that the trial witness'[s] claim of memory loss is feigned or exaggerated does not defeat the inconsistent nature of the prior statement. As set forth above, trial courts lack the tools to determine conclusively whether a witness is being entirely honest about the extent of his or her recollection. Moreover, for the same reasons set forth above, a claim of memory loss should not serve to impede the truth-seeking function of a trial or the applicability of our Rules of Evidence.

---

[8] Defendant Stokes did not object to the admissibility of the statement on the basis that the witness was not subject to cross-examination and failed to raise this issue in his motion for new trial. This issue is waived as to Defendant Stokes. Tenn. R. App. P. 3(e); 36(a).

*Davis*, 466 S.W.3d at 64-65. In *Davis*, the supreme court also commented that the witness, even though suffering from memory loss, was subject to cross-examination, ameliorating any potential *Crawford* violation. *Id.* at 69, n.9. Thus, Defendants are not entitled to relief on this issue.

### III. *Sufficiency of the Evidence*

All three Defendants argue on appeal that the evidence was insufficient to support their convictions. Specifically, Defendant Stokes claims that there was no corroboration of the testimony of the accomplice, Mr. Johnson, and that Mr. Johnson is the only witness who testified that Defendant Stokes was in the car during the shooting. Defendant Stokes acknowledges that Mr. Turner testified to his involvement in the crime, but argues that his testimony was inadmissible. Defendant Brookins claims the testimony of Mr. Johnson was "the only evidence presented at trial that demonstrate[s] any sort of criminal culpability" on his behalf and that Mr. Johnson's testimony was "illogical and irrational." Defendant Clayton argues that evidence was full of inconsistencies and the witnesses were unreliable. Additionally, Defendant Clayton contends that he provided an alibi witness that excluded him from involvement in the crime.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Id.* (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). Therefore, the prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

All three Defendants were convicted of first degree murder, conspiracy to commit first degree murder, two counts of attempt to commit first degree murder, two counts of employing a firearm during a dangerous felony, and reckless endangerment. Defendant Clayton was additionally convicted of being a felon in possession of a firearm.

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors tending to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and preparations before the killing for concealment of the crime, and calmness immediately after the killing." *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

Tennessee Code Annotated section 39-12-103(a) defines the offense of conspiracy as follows:

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

A defendant may not be convicted of conspiracy to commit an offense "unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d). The essential feature of the crime of conspiracy is the "agreement to accomplish a criminal or unlawful

act." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998). To prove a conspiracy, the State need not show a formal agreement between the parties to commit the unlawful act. *See id.*; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). Rather, "a mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement." *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); *see Randolph*, 570 S.W.2d at 871. "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise." *Randolph*, 570 S.W.2d at 871.

A person attempts to commit a criminal offense who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2).

Felony reckless endangerment occurs when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" and uses or displays a deadly weapon. T.C.A. § 39-13-103(a), (b)(2). Tennessee Code Annotated section 39-11-302(c) provides:

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(c). A firearm is a "deadly weapon." T.C.A. § 39-11-106(a)(5)(A).

Finally, Defendants were convicted of employing a firearm during the commission of or attempt to commit a dangerous felony, and the dangerous felony was attempted first degree murder. *See* T.C.A. § 39-17-1324(b), (i)(1)(A). Defendant Clayton was also convicted of being a felon in possession of a firearm pursuant to Tennessee Code Annotated section 39-17-1307.

Identity is an essential element of any crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). Identity may be established with circumstantial evidence alone. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). "[T]he evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt." *Bell*, 512 S.W.3d at 198 (citing *Dorantes*, 331

- 23 -

S.W.3d at 380-81). The jury determines the weight to be given, and inferences to be drawn from, circumstantial evidence. *State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016) (citing *Dorantes*, 331 S.W.3d 379). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

At trial, the State relied, in part, upon a theory of criminal responsibility for the conduct of another, and the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) ); *see State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

The evidence at trial, when viewed in a light most favorable to the State, indicates that all three Defendants were involved in the events which led up to and included the victim's murder. The men met at the home of Mr. Turner, where there was discussion about getting a "body for a body" in retaliation for the murder of Defendant Stokes's sister earlier that day. The men, some of whom were armed, left Mr. Turner's house, in Mr. Johnson's Trailblazer, and were seen driving up and down Durby Circle before shooting the victim from the moving vehicle. Several other children were playing outside in the area when the victim was shot. Mr. Johnson testified that he was driving the red Trailblazer when Defendants Clayton and Brookins fired their guns at the victim. Mr. Johnson also testified that Defendant Brookins called out to the victim to get her attention immediately prior to firing the fatal shot. An eyewitness saw the victim look up as if she heard someone call out to her. Defendant Brookins admitted that he was in the car when the victim was shot. Mr. Johnson's mother overheard a telephone conversation during which Mr. Clayton admitted that he killed the victim. Ms. Hawkins identified Defendant

Clayton in a photographic lineup and at trial. Cell phone data showed that Defendant Clayton was most likely in the area of Durby Circle at the time of the shooting. Likewise, GPS monitoring data showed that Mr. Johnson was likely in the area of Durby Circle at the time of the shooting. Mr. Turner testified that the men returned to his house a short time after they left, acting suspicious. After the men returned, Mr. Turner heard sirens and the men left his house.

While Defendant Stokes argues that the accomplice testimony of Mr. Johnson is uncorroborated, we disagree. It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). The law in Tennessee regarding accomplice testimony has been described as follows:

> The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Whether sufficient corroboration exists is a determination for the jury. *Bigbee*, 885 S.W.2d at 803. Mr. Johnson's testimony was at least slightly corroborated by Mr. Turner, and we have already determined that Mr. Turner's written statement and preliminary hearing testimony were properly admitted. Both men testified that the Defendants met at Mr. Turner's house shortly before the murder. Both men testified that Defendant Stokes wanted "a body for a body." The jury was instructed that Mr. Johnson was an accomplice and that his testimony had to be corroborated before they could convict the Defendants. The jury was charged with assessing the credibility of the witnesses. *Bland*, 958 S.W.2d at 659. By their verdict, they determined that Mr. Johnson's testimony was corroborated. In our view, there was sufficient evidence from which the jury could conclude that Mr. Johnson's testimony was corroborated and to sustain the convictions for each Defendant.

*IV. Sentencing*

Defendants do not challenge their sentences on appeal. The State, however, argues that the trial court improperly merged the conspiracy convictions into the murder convictions. A defendant can, as asserted by the State, be convicted of both conspiracy to commit an offense and the completed offense. *See* T.C.A. § 39-12-106(c); *State v. Watson*, 227 S.W.3d 622, 628 (Tenn. Crim. App. 2006) ("[U]pon conviction for conspiracy and the offense which was the object of the conspiracy, the two offenses are not merged."); *State v. Barbara Mae Potter*, No. E2015-02262-CCA-R3-CD, 2019 WL 453735, at *40 (Tenn. Crim. App. Feb. 5, 2019), *no perm. app. filed*; *State v. Janelle Leigh Potter*, No. E2015-02261-CCA-R3-CD, 2019 WL 453730, at *34 (Tenn. Crim. App. Feb. 5, 2019), *no perm. app. filed*. Each offense contains an element the other does not, so dual convictions do not violate the prohibition against double jeopardy. *State v. Martinos Derring*, No. W2017-02290-CCA-R3-CD, 2019 WL 244471, at *10 (Tenn. Crim. App. Jan. 16, 2019), *perm. app. denied* (Tenn. May 17, 2019); *compare* T.C.A. § 39-12-1-3(a) (conspiracy), *with* T.C.A. § 39-13-202(a) (first degree murder). The legislature, by creating two separate statutes, clearly intended to permit multiple punishments. The trial court herein acknowledged that the merger was potentially incorrect and imposed sentences for the conspiracy convictions. Thus, on remand, the trial court should simply reinstate the conspiracy convictions and sentences as originally imposed without the need for a new sentencing hearing. *See State v. Berry*, 503 S.W.3d 360, 364-65 (Tenn. 2015).

## *Conclusion*

We reverse the trial court's decision to merge the conspiracy convictions into the murder convictions and remand to the trial court for reinstatement of the conspiracy convictions and sentences. In all other respects, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE